IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

AHMED RACHID,

    Defendant.

                                   /

No. C 12-00307 WHA

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

## INTRODUCTION

Defendant Ahmed Rachid moves to suppress evidence obtained pursuant to a search of his cabin on a cruise ship at the San Francisco port. United States Customs and Border Protection interviewed passengers exiting the ship in San Francisco. After an interview with defendant, the customs officer referred him for a "secondary inspection." Officers searched his cabin and found a suitcase containing cocaine. Defendant moves to suppress the evidence and subsequent statements as obtained pursuant to an unreasonable search in violation of the Fourth Amendment. For the reasons stated below, defendant's motion is **DENIED**. As the issue may be resolved as a matter of law, no evidentiary hearing is necessary.

## BACKGROUND

The following facts are taken from the criminal complaint and attached affidavit of an agent of the United States Department of Homeland Security and Immigration and Customs Enforcement. On January 25, 2012, the cruise ship Aurora was docked in the port of San Francisco. Passengers on the ship were interviewed by Customers and Border Protection ("CBP"). Defendant Ahmed Rachid presented a valid Australian passport along with a customs declaration and visa waiver form to customs officer Debbie Le. "During the routine Passport Control check, [Officer] Le engaged Rachid in a conversation regarding his travel." Based on

his answer, Officer Le recommended that Rachid's cabin be searched "under CBP's Border Search Authority." CBP officers, along with agents from Homeland Security, the United States Coast Guard, and the California Highway Patrol searched Rachid's cabin, finding personal effects and locked luggage. CBP officers then escorted Rachid to his cabin, where Rachid "provided the key to his locked luggage and access to his cabin safe." In the locked luggage were brick packages that tested field positive for cocaine.

Rachid was taken into custody and read his Miranda rights. He was subsequently interviewed by officers. Although Rachid disputes whether he waived his Miranda rights before he was interviewed, he told officers that he had agreed to transport cocaine to Australia. Rachid further stated that he planned to contact an associate upon arrival in Australia, where Rachid would be paid for transporting the cocaine.

Rachid moves to suppress the evidence found pursuant to the search of his cabin as obtained in violation of the Fourth Amendment. He also argues that his statements should be suppressed under the fruits of the poisonous tree doctrine. The government counters that because the search was conducted at the border, no showing of suspicion is required in this case. This order addresses only the alleged Fourth Amendment violation, as the parties have not briefed the Miranda issue.

**ANALYSIS**

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" "[T]he Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). At the border, an individual has a lesser expectation of privacy, while the government's "interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152, 154 (2004). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Id.* at 153. Generally, "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and

examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). Under the border search doctrine, a person or his property may be searched without probable cause or reasonable suspicion. *United States v. Seljan*, 547 F.3d 993, 999 (9th Cir. 2008) (*en banc*).

In *Flores-Montano*, the Supreme Court explicitly rejected a balancing test that distinguished between "routine" versus "non-routine" border searches, reversing a decision by our court of appeals and making clear that a showing of "reasonable suspicion" was not required simply because the search in question went beyond a "routine" border search. *Flores-Montano*, 541 U.S. at 152. The Supreme Court left open the possibility that a border search that is unreasonable might require some showing of suspicion, but reserved this possibility only in the case of "highly intrusive searches of the person" or searches of property that are "so destructive as to require particularized suspicion." *Id.* at 152, 154 fn. 2. Decisions from our court of appeals applying the principles stated in *Flores-Montano* have recognized that the reasonable expectation of privacy — even in personal letters and the contents of one's computer — is diminished at the border, whereas the government's interest in searching is at its highest. *Seljan*, 547 F.3d at 1002; *United States v. Arnold,* 553 F.3d 1003, 1008 (9th Cir. 2008).

The search in this case was conducted on a ship that was entering a domestic port for the first time after crossing international boundaries. The search is therefore a border search. *See United States v. Solmes*, 527 F.2d 1370, 1372 (9th Cir. 1975). No probable cause or reasonable suspicion is required to search at the border, as the government is acting pursuant to its longstanding sovereign right to protect itself. *Flores-Montano*, 541 U.S. at 152.

Defendant argues that our court of appeals' decision in *United States v. Alfonso*, 759 F.2d 728 (9th Cir. 1985), is controlling in this case and requires that the government have at least "reasonable suspicion" to search the living quarters of a ship. *Alfonso* considered whether the search of a ship in a domestic harbor was justified as an "extended border search," where the search occurred within a day and a half of the ship's arrival. In considering the search of the ship's living quarters, the court of appeals stated that "a search of the private living quarters of a ship is more intrusive than a search of other areas. The private living quarters are at least

analogous to a private dwelling. As a result, even in the context of a border search, the search of private living quarters on a ship should require something more than naked suspicion." *Id.* at 737-38 (citations omitted). *Alfonso* did not decide what level of showing would be required, but determined that the reasonable suspicion that justified the search of the ship under the extended border search was also sufficient to allow searching the living quarters.

The language in the *Alfonso* case is not controlling here. It is dictum not necessary to the court of appeals' decision, as it goes on to hold that the government had at least reasonable suspicion justifying the search of the entire ship. Even were it considered to be a holding, the reasoning and theory underlying the decision has been undercut by the Supreme Court decision in *Flores-Montano* in such a way that "the cases are clearly irreconcilable." *Miller v. Gamie*, 335 F.3d 889, 900 (9th Cir. 2003) (*en banc*). Moreover, to the extent that the Fourth Amendment "reasonableness" standard requires balancing the government's interest against the individual's, "the degree of intrusion must be viewed in perspective." *Seljan*, 547 F.3d at 1002. Rachid was one of approximately 2,500 passengers on a cruise ship crossing international borders and docking at a United States port. He had knowledge that he would have to cross the border and clear customs, such that any reasonable expectation of privacy he had in his cabin "was necessarily tempered." This was not a highly intrusive search, but one done in a civilized manner not unlike normal customs inspections.

Defendant does not argue that the manner in which the search was conducted was unreasonable. The search did not involve intrusive bodily invasion. Nor does defendant claim his property was unreasonably damaged or that the search was conducted in a "particularly offensive manner." *Arnold*, 533 F.3d at 1007 (citations and quotations omitted). As this order finds that there is no categorical exception to the border search doctrine that requires a higher showing of suspicion to search ship cabins, defendant's motion to suppress is **DENIED**.

**IT IS SO ORDERED.**

Dated: September 24, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

4